347 F.3d 45
 UNITED STATES of America, Appellee,
v.
Jean Maxon LUCIEN, Frantz Mevs, Waldon Desir, Joseph Agnant, Marie Agnant, Sherly Bouche, Max Deralus, Harry Desir, Rhode Dorlus, Gino Faurelus, Pierre Francois, Soline Germain, Jean Germain, Oddy Jean-Marie, Claudia Paul, Joseph Noncent, Daniel Richard, Edouarcin Romeo, Guerline Dormetis, Jean Sereme, Marie Berger, Claudette Augustin, also known as Claudette Franck, Vincent Virgil, Ketty Israel, Lahens Castile, Defendants,
Yves Baptiste, Policia Baptiste, Guerline Dormetis, Defendants-Appellants.
 Docket No. 02-1228.
 Docket No. 02-1266.
 Docket No. 02-1395.
 United States Court of Appeals, Second Circuit.
 Argued March 11, 2003.
 Decided October 14, 2003.
 
 COPYRIGHT MATERIAL OMITTED Jonathan C. Scott, Smithtown, New York (Scott & Scott, LLP, Smithtown, New York, of counsel), for Defendant-Appellant Policia Baptiste.
 Jason L. Solotaroff, New York, New York (Giskan & Solotaroff, New York, New York; Robert A. Culp, Law Office of Robert A. Culp, New York, New York, of counsel), for Defendant-Appellant Guerline Dormetis.
 Martin G. Goldberg, Franklin Square, New York, submitted a brief for Defendant-Appellant Yves Baptiste.
 Andrew J. Frisch, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney, Peter A. Norling, Scott B. Klugman, Assistant United States Attorneys, Eastern District of New York, Brooklyn, New York, of counsel), for Appellee United States of America.
 Before: MESKILL, CARDAMONE, and CABRANES, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 Because health care fraud drains billions of dollars from public and private payers annually, Congress has since 1992 sought a tool to combat this problem. See Comm. on Gov't Reform and Oversight, Health Care Fraud: All Public and Private Payers Need Federal Criminal Anti-Fraud Protections, H.R.Rep. No. 104-747 (1996). In 1996 Congress enacted the latest in a series of health care fraud statutes making any fraud perpetrated against a public or private payer a federal criminal offense. See Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, § 242(a)(1), 110 Stat. 1936, 2016 (1996). Defendants' convictions before us on this appeal were for violations of that statute. Their challenge to the statute's application to frauds they committed against private payers arises from staged automobile accidents and feigned injuries for which medical providers reimbursed them, and raises issues of first impression. Case law interpreting the 1996 federal health care fraud statute is, so far as we can discover, virtually non-existent.
 
 
 2
 Yves Baptiste and Policia Baptiste (unrelated) and Guerline Dormetis (defendants or appellants) appeal from judgments of the United States District Court for the Eastern District of New York (Gleeson, J.), entered on April 10, April 17, and July 26, 2002, respectively, convicting them — after a jury trial — of health care fraud in violation of 18 U.S.C. § 1347. Defendants were sentenced as follows: Yves Baptiste, to 30 days incarceration, which he has served, three years of supervised release, restitution in the amount of $46,701 and a special assessment of $100; Policia Baptiste, to five months incarceration, which she has served, three years of supervised release, restitution in the amount of $41,065 and a special assessment of $100; and Guerline Dormetis, to 21 months incarceration, which she is presently serving, three years of supervised release, restitution in the amount of $56,172 and a special assessment of $100.
 
 
 3
 Defendants challenge their convictions and sentences on a variety of grounds. This opinion considers: (1) whether the federal health care fraud statute applies to the conduct of defendants, who participated as passengers in staged automobile accidents designed to exploit New York's no-fault automobile insurance regime; (2) whether the district court fulfilled its statutory duty to inquire into defendant Yves Baptiste's economic circumstances when imposing restitution; and (3) whether in Dormetis' case the district court improperly (a) calculated the amount of loss attributable to her in determining her base offense level, and (b) enhanced her base offense level for risk of serious bodily injury. Defendants' remaining claims are considered and rejected in a summary order filed concurrently with this opinion.
 
 BACKGROUND
 
 4
 All three defendants participated in staged automobile accidents and fabricated personal injury claims to take advantage of the operation of the New York Comprehensive Motor Vehicle Insurance Reparations Act, see N.Y. Ins. Law § 5101 et seq. (McKinney 2000) (formerly N.Y. Ins. Law § 670 et seq.), more commonly known as the New York No-Fault Act. See generally Montgomery v. Daniels, 38 N.Y.2d 41, 45-49, 378 N.Y.S.2d 1, 340 N.E.2d 444 (1975) (providing a comprehensive description of the No-Fault Act and declaring its constitutionality).
 
 
 5
 The New York No-Fault Act provides compensation for victims of automobile accidents without regard to fault. Central to the law is the requirement that every owner of a motor vehicle maintain a liability insurance policy that provides the owner, members of the owner's household, operators and occupants of the vehicle and pedestrians with compensation for "basic economic loss" resulting from injuries occasioned by the use or operation of that vehicle in New York State, regardless of fault. N.Y. Ins. Law §§ 5102(6), 5103. "Basic economic loss" is defined under the statute to include costs for medical treatment, lost earnings, and other reasonable expenses not to exceed $25 per day. Each person involved in an automobile accident is entitled to reimbursement of up to $50,000 for basic economic loss. Id. § 5102(a)(1)-(3). Under the no-fault law an injured person may assign his or her right to payment for medical expenses to a medical care provider. If an injured person sustains a serious bodily injury, as defined by the statute, that person may also initiate a civil suit for non-economic loss, that is, pain and suffering, against the owner of either car involved in the accident. Id. § 5104.
 
 
 6
 The government proved at trial that defendants were recruited to participate in the charged health care fraud by Binsonn Guillaume, Jackson Clerveaux and Frantz Mevs. The trial in this case was one of six trials arising from related indictments charging numerous individuals with participating in an overarching scheme of health care fraud based on a series of deliberately staged automobile accidents in several boroughs of New York City. This is the first appeal from these trials to reach this Court. Guillaume and Clerveaux — who both testified for the government in the instant case — and Mevs recruited and paid individuals to drive or ride as passengers in vehicles that were deliberately crashed into other vehicles. Following the accidents, the recruited passengers were referred, in exchange for a fee, to various medical clinics in New York City. The recruited passengers assigned their no-fault insurance benefits to the health care clinics (medical providers), which billed the insurance companies directly. The recruited passengers subsequently advanced their own civil causes of action for their feigned injuries. To receive no-fault reimbursements, the health care clinics generated fictitious treatment records for the passengers in the accidents. The accident participants used these fictitious medical records to support their claims of personal injury and to obtain settlements from insurance companies.
 
 
 7
 Each of the present defendants participated in this health care fraud by riding as a passenger in a vehicle that was intentionally crashed into another vehicle. They were involved in separate accidents on different dates. No one was hurt in any of these collisions, but each defendant sought medical benefits for non-existent injuries. The medical providers received payment from insurance companies for imaginary medical expenses allegedly incurred on defendants' behalf, under the no-fault law, as follows: for Yves Baptiste $10,876.91, for Policia Baptiste $9,213.45, and for Guerline Dormetis $6,022.14. In addition to these payments to medical providers, each defendant retained a lawyer and sought damages in a civil suit for feigned personal injuries. Each defendant obtained a settlement from an insurance company, as follows: Yves Baptiste $6,500, Policia Baptiste $1,500, and Guerline Dormetis $7,000. All three defendants were thereafter charged with and convicted of a separate count of health care fraud arising from his or her participation in an arranged accident. They appeal their convictions and sentences. We affirm.
 
 DISCUSSION
 I The Health Care Fraud Statute
 
 8
 On appeal the defendants contest the application of the health care fraud statute, 18 U.S.C. § 1347, to their conduct. They challenge the scope and applicability of the statute on somewhat different bases, although their arguments are simply variations on the same theme. Yves Baptiste, whose arguments we now consider, contends the statute applies only to health care professionals, and that the New York State no-fault automobile insurance program is not a "health care benefit program" within the meaning of the statute. Policia Baptiste's and Dormetis' challenges to the statute on related grounds are addressed in our accompanying summary order.
 
 
 9
 Analysis begins with a review of the two relevant statutory provisions in question, 18 U.S.C. § 1347 and 24(b). Section 1347, that defines the offense of which defendants were convicted, states
 
 
 10
 Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice — (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.
 
 
 11
 18 U.S.C. § 1347.
 
 
 12
 Section 24(b) sets out the relevant definition of a "health care benefit program." It provides
 
 
 13
 As used in this title, the term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.
 
 
 14
 18 U.S.C. § 24(b).
 
 
 15
 With the foregoing definitions in mind, we turn to Yves Baptiste's assertion that the statute applies only to health care professionals and that the New York State no-fault automobile insurance program is not a health care benefit program within the meaning of the statute. These arguments raise questions of first impression and involve statutory construction and questions of law that we review de novo. See United States v. Alfonso, 143 F.3d 772, 775 (2d Cir.1998).
 
 
 16
 It is axiomatic that statutory interpretation begins with the language of the statute, and that "the ordinary meaning of that language accurately expresses the legislative purpose." Park `N Fly v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Where the text of a statute is unambiguous, judicial inquiry ends, except in "rare and exceptional circumstances," and legislative history is instructive only upon "the most extraordinary showing of contrary intentions." Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984).
 
 
 17
 Yves Baptiste points to no legal authority in support of his construction of the statute, and the basic principles of statutory construction identified render his position untenable. We cannot adopt his view that the statute applies only to health care professionals because such construction is obviously at odds with the language of 18 U.S.C. § 1347, which directs that "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice ... to defraud any health care benefit program ... shall be fined under this title or imprisoned not more than 10 years, or both" (emphasis added). The common meaning of the word "whoever" is "whatever person, any person at all, no matter who." Webster's Third New International Dictionary 2611 (1981).
 
 
 18
 Congress' use of this word does not support Baptiste's suggestion that the legislature aimed for the health care fraud statute to apply only to medical professionals. Rather, we read the statute to mean that any person — whether that person is a medical professional, a patient, or otherwise — who purposefully endeavors to defraud a health care benefit program may be found guilty of health care fraud, if his or her conduct otherwise conforms to the elements of the offense. The broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct.
 
 
 19
 Beyond the unambiguous language of the statute, our conclusion that the defendants' participation in staged automobile accidents was encompassed and proscribed by § 1347 is further supported by the legislative history of the statute. Although resort to legislative history is unnecessary in this case precisely because of the statute's unambiguous language, see Garcia, 469 U.S. at 75, 105 S.Ct. 479, we note for the sake of completeness that Congress — while considering the health care fraud legislation — had information before it characterizing staged automobile accidents and attendant fraudulent injury claims as health care fraud. Specifically, House Report No. 104-747 identifies an FBI initiative targeting "staged automobile accidents and related casualty and health insurance fraud" in a list of "[o]ther examples of health care fraud cases." See H.R.Rep. No. 104-747, at 9. Obviously, the kind of conduct underlying the convictions we consider in this appeal was envisioned by Congress when it enacted § 1347.
 
 
 20
 Baptiste endeavors to bolster his argument that the fraud statute should not apply to him by pointing out that the no-fault benefits were paid not to him but to the medical providers and by noting that the passengers in the staged accidents only directly benefitted from the settlement of subsequent civil personal injury claims. This point ignores the fact that the submission of fraudulent no-fault claims by the medical providers and the subsequent settlements received by the defendants as passengers were interdependent parts of one integrated fraudulent plan. To advance personal injury claims and to secure settlement payments from insurers, appellants needed the cooperation of participating clinics that generated falsified treatment records. The clinics, conversely, had a financial stake in participating in the scheme because they received no-fault payments from insurers. Thus, as an intended and necessary consequence of appellants' illegal participation in staged automobile collisions, the clinics received no-fault payments and appellants obtained civil cash settlements from insurers, both of which were integral parts of appellants' fraudulent plan.
 
 
 21
 In addition to declaring that Congress did not intend for the health care fraud statute to apply to persons outside of the medical profession, Yves Baptiste further maintains that the statute is inapplicable to his conduct because the New York State no-fault automobile insurance program is not a health care benefit program within the meaning of the statute. He suggests that the program is distinguishable from "true" health care benefit programs because the New York program does not operate nationwide, and it does not cover all injuries and illnesses — only those resulting from automobile accidents. This argument is wholly without merit because the distinctions Baptiste attempts to make are not relevant to the federal health care fraud statute. The statute provides quite simply that "any public or private plan or contract ... under which any medical benefit, item, or service is provided to any individual" qualifies as a "health care benefit program." 18 U.S.C. § 24(b) (emphases added).
 
 
 22
 In the instant case, private insurers — bound by insurance contracts purchased by vehicle owners pursuant to the No-Fault Act's requirement that vehicle owners maintain a liability insurance policy that provides coverage for automobile accident injuries regardless of fault — reimbursed various medical providers for fraudulently billed medical expenses that were incurred on behalf of Yves Baptiste and the other two defendants. Because Yves Baptiste — as well as Policia Baptiste and Guerline Dormetis — received a medical benefit as a result of the vehicle owners' no-fault insurance contracts, a health care benefit program is, under the statutory definition of § 24(b), plainly implicated.
 
 
 23
 In sum, the federal health care fraud statute applies to defendants' participation as passengers in staged automobile accidents designed to profit from New York's no-fault automobile insurance regime. We recognize that this holding authorizes the application of the federal health care fraud statute to circumstances that are atypical of the health care fraud case law, which to date has concerned itself more exclusively with conduct within the medical community. Despite this factual twist, it is clear that defendants' conduct falls squarely within the unambiguous terms of the statute and therefore the statute applies in the circumstances presented by this case.
 
 II Yves Baptiste's Restitution Order
 
 24
 As a result of his conviction, Yves Baptiste was ordered to pay restitution in the amount of $46,701. This restitution order was based on the money paid to his medical providers, the monies paid to the medical providers of his fellow passengers, and the monies paid to him and his fellow passengers in civil settlements. On appeal, he insists that restitution of $46,701 was an error because it was made without the district court conducting a statutorily-required inquiry. He also challenges the scope of the fraud and loss attributed to him by the district court. We review a district court's order of restitution for abuse of discretion. See United States v. Jacques, 321 F.3d 255, 259 (2d Cir.2003). Insofar as the review involves an interpretation of law, it is de novo, see United States v. Grant, 235 F.3d 95, 99 (2d Cir.2000); where a district court's findings of fact are at issue, we review for clear error, see United States v. Harris, 302 F.3d 72, 75 (2d Cir.2002) (per curiam).
 
 A. Statutory Factors
 
 25
 Appellant avers that in ordering restitution the trial court did not consider any factor except the loss sustained by the insurance companies that made the no-fault medical payments and the payments for civil settlements. He believes the sentencing court erred by failing to consider other statutorily mandated factors, which Baptiste identifies as including his financial resources, financial needs, earning ability and dependants. Appellant does not specify the authority he relies on for his argument, but the language used in his brief tracks the language of 18 U.S.C. § 3663. His apparent reliance upon § 3663 in this case is misplaced because it is inapplicable to his offense. The Mandatory Victims Restitution Act of 1996 (MVRA), enacted as Title II, Subtitle A of the Antiterrorism and Effective Death Penalty Act of 1996, states that the MVRA is, to the extent constitutionally permissible, effective for sentencing proceedings in cases in which the defendant is convicted on or after April 24, 1996. See United States v. Thompson, 113 F.3d 13, 15 n. 1 (2d Cir.1997) (citing 18 U.S.C. § 2248 (statutory notes)). Yves Baptiste's criminal offense was committed on August 1, 1997, and he was convicted on April 10, 2002, meaning that his sentencing proceedings are governed by the MVRA, including 18 U.S.C. § 3663A and the post-1996 version of 18 U.S.C. § 3664.
 
 
 26
 Section 3663A, in contrast to § 3663, makes restitution mandatory for losses suffered by victims of certain crimes — including Baptiste's crime of fraud — and directs that restitution orders be issued and enforced in accordance with § 3664. See 18 U.S.C. § 3663A(c)(1)(A)(ii), (d). Section 3664 states that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (emphasis added). Thus, according to the plain text of the statute, the district court — in determining the restitution amount to be paid by Baptiste — was bound to consider only the victims' losses and was precluded from considering the other factors suggested by appellant. See United States v. Catoggio, 326 F.3d 323, 326 (2d Cir.2003); Harris, 302 F.3d at 75.
 
 
 27
 Although Baptiste's economic circumstances were not relevant to the determination of the amount of restitution, the district court was nonetheless required to consider those circumstances when determining a schedule of payment to satisfy the restitution order. Specifically, § 3664 requires that, in determining a restitution payment schedule, a district court consider the defendant's financial resources and other assets, projected earnings, and financial obligations, including obligations to dependents. See 18 U.S.C. § 3664(f)(2); Catoggio, 326 F.3d at 327; Harris, 302 F.3d at 75.
 
 
 28
 We have held that while a sentencing court need not make detailed factual findings on each factor, the record must disclose some "affirmative act or statement allowing an inference that the district court in fact considered the defendant's ability to pay." See United States v. Kinlock, 174 F.3d 297, 300 (2d Cir.1999); see also Harris, 302 F.3d at 75 (district court's assertion that it read the presentence report will not suffice because it does not indicate the report's contents were considered).
 
 
 29
 Here, the record indicates that during Baptiste's sentencing proceedings, Judge Gleeson addressed Baptiste's longstanding employment history, his military service, his dependant living in Chicago, and his present living arrangements. The trial court also questioned Baptiste's counsel about an error detected on Baptiste's tax returns and made the amendment of the returns a condition of appellant's supervised release. We are satisfied, on this record, that the district court did in fact consider the defendant's ability to pay in setting a payment schedule, as required by § 3664(f)(2). In consequence, ordering Yves Baptiste to make restitution in the amount of $46,701 on a payment schedule of $150 per month did not constitute an abuse of discretion.
 
 B. Scope of Fraud and Loss
 
 30
 As a further challenge to the order of restitution, appellant takes issue with the district court's findings on the scope of fraud and loss attributable to him. He insists the amount of restitution should have been limited either to the amount of his civil settlement or, in the alternative, to that amount plus the amounts paid to medical providers for his treatment. Appellant also believes the trial court should have ordered that his liability be made joint and several with his co-defendant and with the medical care providers who received the no-fault reimbursements.
 
 
 31
 As already noted, appellant's restitution order is governed by the MVRA as codified in 18 U.S.C. §§ 3663A and 3664. Section 3664(h) instructs that
 
 
 32
 [i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.
 
 
 33
 18 U.S.C. § 3664(h).
 
 
 34
 Under the express terms of § 3664, Baptiste's arguments are without merit. First, the district court found that Baptiste participated in a jointly undertaken criminal activity and that the fraudulent medical expenses and civil settlements of each passenger were foreseeable by the other passengers in the vehicle. Because all of the passengers contributed jointly to the loss of each victim, it was not an abuse of discretion for the district court to find both Yves Baptiste and Violette Beaubrun — another convicted passenger involved in the same staged accident — liable for payment of the full amount of loss occasioned by the accident ($46,701). Second, with respect to Baptiste's contention that his liability for restitution should be imposed jointly and severally, we observe that he and his co-defendant Beaubrun were assessed restitution in identical amounts and, although the district court was not explicit, the government concedes and we conclude that the district court intended Baptiste and Beaubrun to be held jointly and severally liable for this loss. Finally, Baptiste's argument that the restitution liability should have been joint and several with the medical care providers who received the no-fault reimbursements is clearly meritless, as those entities were not charged in the indictment or tried with these defendants and the trial court therefore lacked authority to subject them to a restitution order.
 
 III Appellant Dormetis' Appeal
 A. Loss Calculation
 
 35
 We turn now to Guerline Dormetis' appeal. First, she challenges the scope of fraud attributed to her by the district court at sentencing. In calculating the scope of the defendant's loss, it settled on a figure of $115,693.27. It included in the total loss calculation the amounts attributable to Dormetis as well as amounts attributable to other passengers who rode in the same deliberately crashed car. This aggregation of loss amounts was significant because under the 1997 Sentencing Guidelines used to calculate Dormetis' sentence, the amount of loss attributed to her resulted in as much as a three-level enhancement of her base offense level. See U.S.S.G. § 2F1.1(b) (1997). Appellant now contends it was error for the district court to include in the calculation amounts attributable to the other car occupants. We review a district court's interpretation of the Sentencing Guidelines de novo, its findings of fact for clear error, and its application of the Guidelines to the facts for abuse of discretion. United States v. Kang, 225 F.3d 260, 261-62 (2d Cir.2000) (per curiam).
 
 
 36
 Under the Guidelines applicable to Dormetis' sentence, a criminal defendant's offense level is determined not only by her own acts, but also by all the acts and omissions of others whom the defendant aided and abetted, or, "in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1) (1997). Judge Gleeson found appellant aided and abetted in the other occupants' fraud and that the others' fraudulent claims were reasonably foreseeable consequences of the jointly undertaken criminal activity. We perceive no error of law or fact, nor an abuse of discretion, in these conclusions.
 
 B. Risk of Serious Bodily Injury Enhancement
 
 37
 Additionally, Dormetis contests the district court's enhancement of her total offense level during sentencing. In determining Dormetis' total offense level, her base offense level was enhanced by two levels, pursuant to § 2F1.1(b)(4)(A) of the 1997 version of the United States Sentencing Guidelines, which applied to Dormetis' sentencing. See U.S.S.G. § 2F1.1(b)(4)(A) (1997). This provision of the Guidelines directs that, with respect to offenses involving fraud or deceit, the offense level should be increased by two if the offense involved "the conscious or reckless risk of serious bodily injury." See id. This sentence enhancement provision codified at § 2F1.1(b)(4)(A) in the 1997 Sentencing Guidelines is now codified at § 2B1.1(b)(11)(A).
 
 
 38
 Dormetis contests the decision to adjust her offense level on the basis of this enhancement, arguing that while the Guidelines require a specific finding that she was conscious of or in reckless disregard of a risk of serious bodily injury, the district court expressly found that she was not aware of the dangerousness of her conduct.
 
 
 39
 In protesting the district court's application of the offense level enhancement to her offense, Dormetis makes much of that court's comment that it did not "mean to suggest" that Dormetis was "necessarily aware that she was putting her health and life at risk" or that she "knowingly put life and limb at risk." Judge Gleeson added that "[m]ore often than not she thought she could get into a fender bender and make money." Appellant believes these statements mean the district court found that she did not act while conscious of, or in reckless disregard of, a risk of serious bodily injury and that the enhancement is thus improper in her case.
 
 
 40
 Appellant's insistence that the above statements somehow invalidate the application of the enhancement is unavailing. Not every utterance of a district court may be construed by a reviewing court as a finding of fact and all utterances should be interpreted in light of the circumstances before the court. In the case at hand, the relatively equivocal statements Dormetis points to were made by the district judge as an aside during a discussion of an unrelated motion for a downward departure, and thus we do not deem the comments to constitute relevant findings of fact. Further, the remarks when placed in context seem simply to refer to the degree to which Dormetis thought that her own safety was at risk as a result of her participation in the deliberately caused accident, and not to the degree to which she understood that drivers and passengers in other vehicles may have been imperiled. On the latter point, the district court did make findings, which could not be clearer. Noting that the driver of another car in one deliberately caused accident ended up in the opposite lane facing oncoming traffic, the district judge stated that "[t]he risk of bodily injury inheres in any deliberately caused accident" and found that "the risk of bodily injury is patent in this type of criminal activity." In addition, as we explain below, whether or not appellant was herself mindful of the dangerousness of her conduct, she is nonetheless subject to the enhancement because her conduct was reckless.
 
 
 41
 We observe that there has been some disagreement among our sister Circuits regarding the proper construction of the Guidelines requirement that an offense involve "conscious or reckless risk of serious bodily injury." The Eighth Circuit, on the one hand, has appeared to distinguish between a conscious risk and a reckless risk by holding that an offense involves a conscious risk when the defendant is aware of the risk but consciously disregards it, whereas a reckless risk is one that the defendant recklessly disregards despite his awareness of the risk. See United States v. McCord, Inc., 143 F.3d 1095, 1098 (8th Cir.1998). The Ninth Circuit has resisted this analysis for several reasons. First, the Ninth Circuit has pointed out that, if an offense that involves a "reckless risk" of injury requires an awareness of the risk, there is no meaningful distinction between a "reckless risk" and a "conscious risk" as the terms are used in the Guidelines. See United States v. Johansson, 249 F.3d 848, 858 (9th Cir.2001) ("The use of the disjunctive conjunction `or' between `conscious' and `reckless' ... suggests that a conscious risk of injury is something different from and an alternative to a reckless risk of injury."). The Ninth Circuit has also pointed out that the Guidelines describe a "reckless risk," and not "the reckless disregard of a known risk." See id. at 858-59 & n. 4. Finally, the Ninth Circuit has pointed out a flaw that results from the Eighth Circuit's framework, namely, that a defendant can escape the application of the enhancement by claiming that he was not aware that his conduct created a serious risk. See id.
 
 
 42
 We are persuaded that the approach taken by the Ninth Circuit, including its conclusion that a defendant does not have to subjectively know that his or her conduct created a serious bodily risk, is correct. Accordingly, we read the Sentencing Guidelines to say that, in order for the 1997 § 2F1.1(b)(4)(A) enhancement to apply, a defendant's fraudulent conduct must have created a risk that others would suffer serious bodily injury; moreover, said risk must have either been known to the defendant (conscious), or, if unknown to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do (reckless). See id.
 
 
 43
 In the case at bar, appellant is subject to the offense level enhancement of § 2F1.1(b)(4)(A), whether or not she intended or subjectively understood the risk of serious bodily injury, because it is beyond cavil that her conduct was reckless. See United States v. Hoffman, 9 F.3d 49, 50 (8th Cir.1993) (per curiam) (upholding application of § 2F1.1(b)(4)(A) adjustment in a nearly identical case where the defendant deliberately caused accidents, feigned injuries and submitted fraudulent medical bills). The jury found that Dormetis intended to participate in a staged, deliberate auto accident, and the district court further found that the serious risk of bodily injury was inherent to this type of criminal activity. As a consequence, it was not an abuse of the district court's discretion to enhance by two her offense level pursuant to § 2F1.1(b)(4)(A).
 
 CONCLUSION
 
 44
 Accordingly, for the foregoing reasons, as well as for the reasons stated in the order filed concurrently with this opinion, the judgments of conviction and the sentences imposed on defendants are affirmed.