366 F.3d 95
 UNITED STATES of America, Appellee,
v.
Sergey BIRKIN, German Yagupolsky, Oleg Kholodenko, Yana Desedensko, also known as Yana Dedusenko, Pabel Tisnovsky, Victoria Volfson, also known as Vika Volfson, Edouard Borisov, Dimitriy Zibrov, also known as Dima Zibrov, and Lilya Borochina, Defendants,
Dima Koner, also known as Dima Lnu, also known as David Koner, Defendant-Appellant.
 No. 03-1281.
 United States Court of Appeals, Second Circuit.
 Argued: March 8, 2004.
 Decided: May 3, 2004.
 
 Debra A. Karlstein, New York, NY, for Defendant-Appellant.
 Miriam E. Rocah, Assistant United States Attorney, and Gary Stein, Assistant United States Attorney (on the brief), for David N. Kelley, United States Attorney for the Southern District of New York, for Appellee.
 Before: WALKER, Chief Judge, CARDAMONE and KEITH, Circuit Judges.*
 KEITH, Circuit Judge.
 
 
 1
 Defendant-Appellant Dima Koner appeals from a judgment of conviction following a jury trial in the United States District Court for the Southern District of New York (John S. Martin, J.). Koner was convicted of (1) conspiracy to commit mail fraud and making false statements in connection with health care matters in violation of 18 U.S.C. § 371; (2) mail fraud in violation of 18 U.S.C. § 1341; and (3) making false statements in connection with the payment of health care benefits in violation of 18 U.S.C. § 1035. The district court sentenced Koner to a term of 24 months' imprisonment, to be followed by 2 years' supervised release.
 
 
 2
 Koner now appeals his judgment of conviction arguing that he was deprived of a fair trial due to ineffective assistance of counsel. Koner claims that his attorney failed to investigate and present exculpatory testimony that would have established that Koner did not commit the charged crimes. Koner also appeals his sentence arguing that the district court erred in applying a three-level enhancement pursuant to United States Sentencing Guidelines ("Sentencing Guidelines") § 3B1.1(b). U.S.S.G. § 3B1.1(b). Koner claims that the district court impermissibly sentenced him as "a manager or supervisor ... [of a] criminal activity involv[ing] five or more participants or [that] was otherwise extensive," pursuant to § 3B1.1(b).
 
 
 3
 For the reasons set forth below, we find that Koner's ineffective assistance of counsel claim is without merit, and affirm the judgment of conviction. As the district court did not make a specific factual finding concerning Koner's alleged role as a "manager" or "supervisor," however, this court cannot determine whether Koner's sentence was properly increased pursuant to § 3B1.1(b) of the Sentencing Guidelines. Accordingly, we remand for the district court to make the requisite factual findings.
 
 I. BACKGROUND
 
 4
 In September 2000, the Federal Bureau of Investigation ("FBI") began an undercover investigation of Tender Medical Clinic in Brooklyn, New York based on information that Tender Medical Clinic operated a scheme to defraud insurance companies by submitting fraudulent claims of medical injuries. FBI Special Agent Melvin Bailey contacted Alexander Gvozdev, an FBI informant, to assist in the undercover operation. Agent Bailey asked Gvozdev to pose as a Russian criminal interested in the process of staging automobile accidents. Agent Bailey instructed Gvozdev to contact Sergey Birkin, who was known for his involvement with staged automobile accidents and relationships with medical clinics that filed fraudulent insurance claims.
 
 
 5
 In a recorded conversation on September 9, 2000, Birkin explained to Gvozdev how the accident should be staged and how the fraud scheme would work, including the later involvement with the medical clinic and lawyers. On September 14, 2000, Gvozdev introduced Birkin to Agent Bailey as his associate, "Joe Carbo," who would participate with him in the staged accident.
 
 
 6
 On January 5, 2001, as part of the undercover operation, the FBI staged an automobile accident in Manhattan. An undercover FBI agent crashed into an empty van. Following the crash, the police arrived on the scene and made a police accident report. Agent Bailey, acting as "Joe Carbo," Gvozdev, and Alexander Sasha Kochan, whom Birkin introduced as a passenger, falsely stated that they were in the van and were injured as a result of the accident.
 
 
 7
 Following the staged accident, on January 10, 2001, Agent Bailey and Gvozdev met with Birkin, reported that they had staged the accident, and showed him the police accident report. On January 13, 2001, Birkin instructed Gvozdev and Agent Bailey to go to Tender Medical Clinic and meet with Oleg Kholodenko, one of the clinic's managers. Koner and German Yagupolsky were also managing the clinic at that time. Agent Bailey and Gvozdev went to Tender Medical Clinic and were treated for fictitious injuries and instructed to return to the clinic for further treatment. In the months following the staged accident, Agent Bailey, Gvozdev, and Kochan received unnecessary medical treatment, on an average of three times per week, at Tender Medical Clinic for their feigned injuries. They also signed in for treatment they never received. Tender Medical Clinic subsequently submitted fraudulent claims for Agent Bailey, Gvozdev, and Kochan's treatment for nearly $40,000 to Liberty Mutual Insurance Company.
 
 
 8
 During this undercover operation, Gvozdev tape-recorded numerous conversations. The Government submitted as evidence against Koner two tape-recorded meetings at Tender Medical Clinic, one on January 25, 2001 and another on March 9, 2001. These tape-recorded meetings became the Government's primary direct evidence against Koner. The tape-recordings of the two meetings, together with Gvozdev's testimony identifying the voices heard thereon, established that on January 25, 2001, Koner, Yagupolsky, and Kholodenko discussed with Gvozdev their dissatisfaction with "Joe Carbo," undercover Agent Bailey. They stated that he did not complain enough about his injuries during his medical examination. During the January 25, 2001 meeting, Koner and Kholodenko also explained the importance of going to a lawyer whom they suggested. Koner explained that the claimants only needed to see the lawyer once and then the lawyer would handle the rest. Koner noted that the claimants could meet with the attorney or the paralegal "Vika," a nickname for defendant Victoria Volfson.
 
 
 9
 The recordings, along with Gvozdev's testimony, further established that, on March 9, 2001, Yagupolsky and Koner met with Gvozdev again and expressed their concern that Gvozdev, "Joe Carbo," and Kochan had not met with a lawyer yet. At this same meeting, Koner instructed Gvozdev how to avoid testifying under oath by submitting to an independent medical exam conducted at the instance of the insurance company. The meeting participants also discussed their dissatisfaction with Birkin for misleading Gvozdev and Kochan into believing they would only need to come to the clinic a few times as part of the scheme, as opposed to three times a week for several months. Koner stated that he would not take any more clients from Birkin.
 
 
 10
 On March 13, 2001, Agent Bailey, Gvozdev, and Kochan visited the office of attorney Alexis Ravitch and met with Volfson ("Vika"), the paralegal whom Koner had mentioned at the January 25, 2001 meeting. Agent Bailey, Gvozdev, and Kochan filled out various forms and discussed the nature of the accident and their injuries. After the meeting, they informed Tender Medical Clinic that they had visited the attorney.
 
 
 11
 Based on the evidence obtained from this undercover operation, the Government indicted Koner, along with nine co-defendants, for participating in a scheme to defraud insurance companies. Five of the co-defendants pled guilty to various counts of the indictment and another defendant, Birkin, remains a fugitive. Koner and the three remaining co-defendants proceeded to trial. At trial, the redacted indictment contained three counts. Count I charged Koner and the three co-defendants with conspiracy to commit mail fraud and making false statements in connection with health care matters in violation of 18 U.S.C. § 371. Count II charged Koner and the three co-defendants with mail fraud in violation of 18 U.S.C. § 1341. Count III charged Koner and the three co-defendants with making false statements in connection with the payment of health care benefits in violation of 18 U.S.C. § 1035.
 
 
 12
 On October 7, 2002, the jury trial commenced. The Government's witnesses included (1) Gvozdev, who testified as to Koner's voice and presence at the two tape-recorded meetings; (2) Agent Bailey, who testified as to the staged accident and the treatment at the clinic; (3) Paulina Shchukina, a Russian translator who translated the various recorded conversations involving the defendants from Russian into English; (4) Marian Montavi, a representative of Liberty Mutual Insurance Company, a victim of the fraudulent scheme charged in the indictment; and (5) two FBI agents who testified about post-arrest statements provided by two co-defendants. The Government's proof also included various tape-recordings of conversations, including the January 25, 2001 and March 9, 2001 meetings discussed above, and documents from Tender Medical Clinic and the victim insurance company.
 
 
 13
 Koner's only defense witness was Joanne Pollari, who testified that Koner was employed as a deliveryman in her fast food restaurant from 1993 to 1999. Pollari also testified that she opened a new restaurant and that Koner worked there until it was sold on January 5, 2001.
 
 
 14
 On October 18, 2002, Koner was convicted on all three counts of the indictment. Following trial, on November 12, 2002, Koner moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("FRCP") 29 and for a new trial pursuant to FRCP 33. Koner argued that the admission of his co-conspirator's guilty plea was improper and allowed the jury to draw an impermissible assumption about his guilt. Subsequently, on January 13, 2003, Koner filed a letter with the district court in further support of his FRCP 29 and FRCP 33 motions. The letter attached the results of a "Voice Identification Examination" made by Tom Owen of Owl Investigations, Inc., allegedly an expert in voice identification, regarding three statements that the Government attributed to Koner from the January 25, 2001 meeting. Based on a comparison of the January 25, 2001 recording and a voice exemplar, Owen opined that Koner had not made the three statements.
 
 
 15
 The district court held oral argument on these post-trial motions on January 14, 2003. The district court denied the motions on the merits after concluding that, even assuming Koner did not make the three statements allegedly misattributed to him in the January 25, 2001 meeting, the evidence established his guilt. Specifically, the district court found that the evidence at trial showed that Tender Medical Clinic was involved in substantial fraud; that Koner continued to be manager of the clinic; and that he actively participated in the March 9, 2001 meeting in furtherance of the conspiracy.
 
 
 16
 The Probation Office submitted a presentence report, which calculated Koner's offense level at seventeen as follows: (1) a base level of six, pursuant to § 2B1.1 of the Sentencing Guidelines; (2) an eight-level increase, pursuant to § 2B1.1(b)(1)(E) of the Sentencing Guidelines based on a foreseeable loss of $110,279.78; and (3) a three-level increase pursuant to § 3B1.1(b) of the Sentencing Guidelines based on Koner's managerial or supervisory role in the criminal activity. With a total offense level of seventeen and a criminal history category of I, Koner's sentencing range was 24-30 months' imprisonment.
 
 
 17
 In advance of sentencing, Koner submitted a letter, dated April 9, 2003, arguing that he should not receive the three-level role enhancement because he was only "President of La Fa Management," Tender Medical Clinic's management company. Koner claimed it was only a "figurehead" position. The Government responded that the evidence supported a three-level enhancement because Koner knowingly helped manage the medical clinic, which was built on fraud, and participated in meetings discussing how to carry out the fraud. On April 15, 2003, the district court sentenced Koner to a term of 24 months' imprisonment, to be followed by 2 years' supervised release.
 
 
 18
 This timely appeal followed.
 
 II. DISCUSSION
 A. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 19
 Koner argues that he was deprived of a fair trial due to ineffective assistance of counsel. He claims that, despite his repeated requests, his attorney refused during the course of the trial to investigate and present a voice identification analysis of the two tape-recorded conversations, which constituted the primary evidence against Koner. After conviction, Koner's attorney finally consulted Tom Owen of Owl Investigations, Inc., a voice identification analyst. Owen analyzed three statements that the Government had attributed to Koner from the January 25, 2001 meeting. The three statements were: (1) "You can gesture"; (2) "[i]t was hurting a little bit ... didn't even want to mention. But then it got worse, and worse, and worse"; and (3) "[h]e thought he would wait until the pain subsides." Based on a comparison of the January 25, 2001 recording and a voice exemplar, Owen opined that Koner did not make these three statements.
 
 
 20
 Koner argues that his attorney's presentation of this voice identification evidence would have undermined Gvozdev's testimony as to Koner's participation and presence at the two meetings, which was the only direct evidence against Koner. Koner claims that Gvozdev was an unreliable witness and this evidence would have impeached his credibility. Moreover, Koner emphasizes that the evidence against him was "razor-thin" as he was not involved in the staged accident, did not even work at Tender Medical Clinic until January 2001, and did not sign any of the fraudulent insurance documents. As a result, Koner argues that his attorney's deficient performance caused him prejudice because he believes the jury would have acquitted him with the voice identification evidence.
 
 
 21
 The Government argues, in response, that Koner's attorney did not render constitutionally ineffective assistance of counsel by choosing not to present voice identification evidence. The Government claims that counsel's decision was a question of trial strategy and objectively reasonable. Moreover, the Government argues that this type of voice identification evidence would likely be inadmissible and related only to three statements from the two meetings. The Government submits that even if Koner's attorney was deficient, Koner cannot demonstrate prejudice due to the abundant evidence of his guilt.
 
 
 22
 In order to prevail on a claim for ineffective assistance of counsel, a defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness... under prevailing professional norms"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); United States v. Monzon, 359 F.3d 110, 119 (2d Cir.2004). The burden of establishing both constitutionally deficient performance and prejudice is on the defendant. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
 
 
 23
 In the instant matter, Koner has failed to establish prejudice. As the district court correctly held, even assuming Koner was not the speaker at the January 25, 2001 meeting, the evidence was still sufficient to establish his guilt. First, Koner did not, during the course of trial or the post-trial motions, dispute his presence at the January 25, 2001 meeting. Second, Koner only disputes three statements from that meeting, which leaves several other statements to support his knowledge of and participation in the scheme. Third, the jury could reasonably have determined that Koner was present at the March 9, 2001 meeting and, therefore, had knowledge of and participated in the scheme. At this meeting, [Dima] Koner's presence is acknowledged twice. Gvozdev states, "[o]h, there's no fucking point in talking about it! Nothing can be corrected now, Dima." This statement follows a statement that Koner allegedly made and the attribution of which he had not disputed with voice identification evidence. Gvozdev, making another statement in response to Koner, states, "[w]ell, no, damn it, Dima, I just don't want to... These are your issues, this is your business...." Last, Koner helped manage Tender Medical Clinic and continued to manage the clinic after both these meetings. Certainly, the jury could have reasonably determined that Koner, as a manager of the clinic, had knowledge of what was going on in the clinic.
 
 
 24
 Koner has only disputed, with voice identification evidence, three statements from the January 25, 2001 meeting. Accordingly, even if counsel's performance was deficient and he should have investigated and presented a voice identification analysis, such conduct did not cause Koner prejudice as the jury had ample other evidence from which to find guilt. If a defendant has failed to show prejudice, this court need not consider the objective reasonableness of counsel's actions. See Hill v. Lockhart, 474 U.S. 52, 60, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Thus, Koner's conviction is affirmed.
 
 B. THREE-LEVEL ENHANCEMENT
 
 25
 Koner also argues that the district court erred when it applied a three-level enhancement for his managerial role pursuant to § 3B1.1(b) of the Sentencing Guidelines. Koner argues that the district court made no findings to support its conclusion that he was a "manager" or "supervisor" of the criminal activity of which he was convicted and that, in any event, no such findings could have been made based on the evidence presented at trial.
 
 
 26
 In reviewing a sentence imposed under the Sentencing Guidelines, this court accepts the district court's factual findings unless they are clearly erroneous. 18 U.S.C. § 3742(e). We will not overturn the district court's application of the Sentencing Guidelines to the facts before it unless we conclude that there has been an abuse of discretion. Where a sentencing court's application of the Sentencing Guidelines, however, approaches a purely legal question, we use a de novo standard of review. United States v. Deming, 269 F.3d 107, 109 (2d Cir.2001) (citing United States v. Hernandez-Santiago, 92 F.3d 97, 100 (2d Cir.1996)).
 
 
 27
 Section 3B1.1(b) sets forth enhanced penalties for defendants who act as organizers, leaders, managers, or supervisors of group criminal activity. A three-level enhancement is applicable "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). To qualify for the enhancement, a defendant need only have managed or supervised one participant. United States v. Burgos, 324 F.3d 88, 92 (2d Cir.2003) (citing United States v. Payne, 63 F.3d 1200, 1212 (2d Cir.1995)). Although the Sentencing Guidelines do not define the terms "manager" or "supervisor," this court has held that "[a] defendant may properly be considered a manager or supervisor if he `exercise[d] some degree of control over others involved in the commission of the offense ... or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" United States v. Blount, 291 F.3d 201, 217 (2d Cir.2002) (quoting Ellerby v. United States, 187 F.3d 257, 259 (2d Cir.1998) (per curiam); see also U.S.S.G. § 3B1.1(b), cmt. n. 4).
 
 
 28
 "In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role." United States v. Stevens, 985 F.2d 1175, 1184 (2d Cir.1993) (citing United States v. Lanese, 890 F.2d 1284, 1294 (2d Cir.1989)). Although this requirement of making specific factual findings may "`interfere with the smooth operation of the sentencing hearing,'" this court requires specific factual findings to permit meaningful appellate review. Stevens, 985 F.2d at 1184 (quoting United States v. Mejia-Orosco, 867 F.2d 216, 221 (5th Cir.1989)).
 
 
 29
 Here, the district court failed to make specific factual findings. The district court simply stated, "I think that the defendant did meet the qualifications of the guideline for the 3-point enhancement for supervisor.... While it is unfortunate [that] circumstances under which the defendant became involved in this fraud, he did become involved in it and he did take an active part in it." Joint Appendix 336. Nowhere has the district court set forth specific factual findings regarding why it considered Koner a "manager" or "supervisor" pursuant to § 3B1.1(b) of the Sentencing Guidelines. Accordingly, we remand to the district court for a specific factual finding regarding the enhancement as the Sentencing Guidelines require.
 
 III. CONCLUSION
 
 30
 For the reasons set forth herein, Koner's judgment of conviction is affirmed. As the district court did not make specific factual findings regarding the three-level enhancement for Koner's role pursuant to § 3B1.1(b) of the Sentencing Guidelines, however, we vacate the sentence and remand for the district court to make specific factual findings in support of the enhancement.
 
 
 
 Notes:
 
 
 *
 The Honorable Damon J. Keith, Circuit Court Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation